UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CHRISTOPHER BOELTER,

    Plaintiff,

  v.                                                                                       Case No. 23-CV-416-SCD

COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,

    Defendant.

---

## DECISION AND ORDER

---

Christopher Boelter applied for social security benefits based on a host of physical and mental health conditions. After a hearing, an administrative law judge denied the claim for benefits, finding that Boelter could perform sit-down jobs with certain limitations. Boelter seeks judicial review of that decision, arguing that the ALJ erred in assessing his residual functional capacity (RFC)—that is, his maximum capabilities despite his limitations. Because substantial evidence supports the physical and mental RFC assessed by the ALJ, and because Boelter has not shown that the ALJ reversibly erred in evaluating his functional limitations, I will affirm the denial of disability benefits.

## BACKGROUND

In 2020, Boelter applied for supplemental security income under Title XVI of the Social Security Act, claiming that he became disabled in 2014 due to various physical and mental impairments.

I. **Medical Background**

The record documents a long history of medical issues, starting with Boelter's back. For example, an MRI from August 2020 revealed mild to moderate multilevel degenerative changes in the lumbar spine. R. 256.[1] Boelter reported that the pain radiated down both legs, and he received several steroid injections that provided minimal relief. R. 274–76, 289–90, 700–01, 839. Boelter later reported that the pain also radiated into both hips. R. 839. He told providers that the pain in his back, legs, and hips persisted despite rest, physical therapy, and medications. Given these issues—as well as several reported falls—he started using a cane to help ambulate. *See* R. 434, 504, 509, 629, 651, 701, 768, 805, 812, 827, 839, 867, 881, 910, 936, 984, 999, 1039, 1053, 1097, 1115, 1123, 1140. Complicating matters was Boelter's weight, which was consistently around 400 pounds. *See* R. 63, 190, 389, 620, 625, 631, 768.

Boelter also suffered from multiple issues with his left (dominant) upper extremity. After complaining about ongoing pain, numbness, and weakness in his hand and wrist, Boelter underwent an EMG in early 2020, which revealed very mild distal left ulnar neuropathy. R. 291–92. In September 2020, Boelter had a neuroma removed from his left hand. R. 283–84, 391–92. He participated in occupational therapy after the surgery, and, while he made some progress initially, he continued to complain about ongoing symptoms. *See* R. 379–97, 402–56. In September 2021, Boelter was given a peripheral nerve block, but it didn't alleviate his hand and wrist issues. R. 719–25, 1075–90. Boelter's hand specialist, Scott Olvey, MD, indicated in June 2022 that Boelter was at maximum medical improvement. R. 1075. He further indicated that Boelter had ongoing neuropathy of the superficial branch of the radial nerve and that they'd exhausted all treatment options. According to Dr. Olvey,

---

[1] The transcript is filed on the docket at ECF No. 9-1 to 9-2.

Boelter continued to experience numbness and hypersensitivity that weakened his grip and significantly limited the function of his left hand. Dr. Olvey stated that, while Boelter was able to use his left hand for light activities, he would have difficulty with weight bearing greater than about five or ten pounds.

The record also documents gastrointestinal issues such as irritable bowel syndrome. Boelter reported having frequent diarrhea and needing to constantly go to the bathroom. *See* R. 257, 398–401, 651. He underwent a colonoscopy in December 2020, which revealed internal hemorrhoids but otherwise was normal. R. 257–58. In February 2021, Boelter went to the emergency department complaining about rectal pain and diarrhea lasting four to five hours. R. 398–401. The examination revealed external hemorrhoids, and he was given a rectal suppository. At a follow-up appointment a few days later, Boelter's primary care provider instructed him to stop taking his diabetes medication, as that may have been causing his GI issues. R. 642–47. Boelter reported some improvement after stopping the medication, though he still occasionally had diarrhea. *See* R. 620–24, 781–948.

The record documents several other health issues, including chronic pain syndrome, diabetes mellitus, diabetic peripheral neuropathy, high blood pressure, asthma, obstructive sleep apnea, gastroesophageal reflux disease, and hearing issues. *See* R. 280, 286, 308, 310, 315, 339, 381, 388, 406, 460, 472–73, 631, 797–98, 819–20.

In addition to those physical ailments, Boelter has been treated for mental health issues. He participated in psychotherapy for depression and anxiety stemming largely from his health issues, lack of income, and relationship struggles. *See* R. 300, 303, 470–610, 624, 646, 652, 771, 867, 881, 904, 936–37, 1039, 1096–97. During those therapy sessions, Boelter frequently exhibited a sad mood, a depressed or tearful affect, and poor coping skills. He also

3

appeared agitated and irritated at times and shouted at his providers. R. 642–47, 800–05. Boelter was prescribed medications for major depressive disorder and anxiety, which were adjusted as necessary. *See* R. 624, 630, 647, 654, 681, 783, 789, 805, 812, 827, 882, 904, 911, 931, 938, 951, 953, 957, 999, 1054, 1097, 1115, 1124. Nevertheless, the psychiatric treatment notes do not list any issues with attention or concentration. *See* R. 470–610.

## II. Procedural Background

Boelter applied for social security benefits in December 2020. R. 18, 171–72. He alleged that he became disabled on January 1, 2014, due to sleep apnea, lower back problems (herniated discs), surgeries on his left hand, permanent nerve damage to his left hand, asthma, hearing loss, anxiety, depression, abdominal pain, and frequent diarrhea. R. 189–99, 201–08. Boelter asserted that his impairments caused difficulty lifting, squatting, bending, standing, walking, sitting, kneeling, climbing stairs, remembering, completing tasks, concentrating, using his hands, and getting along with others. R. 206. He also asserted that he had a short attention span, he didn't get along well with authority figures, and he used a cane whenever he walked anywhere. R. 206–07.

The state agency charged with reviewing the applications on behalf of the Social Security Administration denied Boelter's claim initially and upon his request for reconsideration. *See* R. 62–79. The reviewing psychologists determined that Boelter's depression and anxiety were severe but not disabling. R. 65–69, 73–77. Specifically, they found that Boelter had no limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; no limitation in concentrating, persisting, or

4

maintaining pace; and a moderate limitation in adapting or managing oneself.[2] With respect to social interactions, the reviewing psychologists found that Boelter was moderately limited in his ability to interact appropriately with the general public and accept instructions and respond appropriately to criticism from supervisors. Robert Barthell, PsyD, the reviewing psychologist at the initial level of review, believed that Boelter's mental health symptoms would be aggravated by more than superficial interaction with the general public and situations requiring criticism from authority figures. R. 68–69. Dr. Barthell also indicated that supervisor feedback would be better received with focus on strengths and in a private setting. John Warren, EdD, the reviewing psychologist at the reconsideration level, believed that Boelter could sustain the basic demands associated with relating adequately with supervisors and co-workers but could handle only limited contact with the general public. R. 76–77.

After the state agency denial, Boelter had a hearing before an ALJ. *See* R. 37–61. Boelter, who was represented by counsel at the hearing, testified that he last worked in 2010 as a medical transport driver. R. 42–43. He said he was fired after only a year on the job due to non-compliance, including talking rudely on the CB radio. Boelter told the ALJ that he couldn't return to that job—or any other work—because he had constant pain in his lower back, sacroiliac joints, both legs, and left arm. R. 45–46. He also described having hypersensitivity and loss of strength in his arm. R. 50. According to Boelter, the issues were so severe that he couldn't do much with that extremity and he was training himself to be right-handed. R. 50–54.

---

[2] These four areas of mental functioning are known as the "paragraph B" criteria. The paragraph B criteria are measured on a five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2).

Boelter also testified about his daily activities. He said he needed help bathing and getting dressed, he rarely cooked, he didn't perform any household chores, and he cut the grass occasionally. R. 46–47. Boelter indicated that he used power carts when shopping in stores, if they were available. R. 47–49. He also indicated that he used a cane whenever he left the house, which he said was recommended to him by one of his doctors after several falls. R. 49.

Deborah Lee testified at the hearing as a vocational expert. R. 55–60. Lee said that a hypothetical person with Boelter's vocational profile could not perform the driver job if he were limited to a restricted range of sedentary exertional work, including the ability to understand, remember, and carry out simple instructions; regular work duties and expectations with occasional changes; occasional interaction with co-workers; and no interaction with the public. R. 56–57. However, Lee said that person could perform other unskilled, sedentary jobs such as a final assembler, an inspector/sorter, and a document preparer. R. 57. Lee indicated that the same jobs would be available if the person could use his left hand on a frequent basis but not if he could use that hand only occasionally. R. 57–58. Lee further indicated that the person could perform those sit-down jobs if he needed a cane to ambulate. R. 58–59. According to Lee, employers tolerate employees to be off task up to twenty percent of the workday and typically offer three breaks throughout the day. R. 59. Boelter's attorney did not ask Lee any questions at the hearing. R. 60.

In October 2022, the ALJ issued a written decision denying Boelter's disability application. *See* R. 15–36. He considered the application under 20 C.F.R. § 416.920(a), which sets forth a five-step process for evaluating SSI claims. *See* R. 18–32.

6

Case 1:23-cv-00416-SCD   Filed 02/23/24   Page 6 of 18   Document 21

At step one, the ALJ determined that Boelter had not engaged in substantial gainful activity since the day he applied for benefits, December 7, 2020. R. 20.

The ALJ determined at step two that Boelter had ten severe impairments: lumbar degenerative disc disease; bilateral hip disorder; chronic pain syndrome; left hand neuroma; left hand ulnar neuropathy; diabetes mellitus; diabetic peripheral neuropathy; obesity; depressive disorder; and anxiety disorder. R. 20–21. According to the ALJ, Boelter's IBS did not more than minimally impact his ability to perform basic work activities. She noted that Boelter went to the emergency room in February 2021 complaining of rectal pain and diarrhea. R. 21 (citing Exhibit 4F/1–3). The ALJ also noted, however, that Boelter reported some improvement in his diarrhea following a change in medications and that there was little evidence of ongoing IBS issues. R. 21 (citing Exhibits 6F/5; 9F).

At step three, the ALJ determined that Boelter did not have an impairment, or a combination of impairments, that met or medically equaled the severity of a presumptively disabling impairment listed in the social security regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1 (i.e., "the listings"). R. 21–24. The ALJ found that Boelter had a mild limitation in understanding, remembering, or applying information and a moderate limitation in each of the other three paragraph B criteria. When discussing Boelter's ability to interact with others, the ALJ did not specifically mention Boelter's reported issues with supervisors. R. 23.

The ALJ next assessed Boelter's residual functional capacity, finding he could perform a restricted range of sedentary exertional work. R. 24. Specifically, the ALJ found that Boelter could never climb ropes, ladders, or scaffolds; could never work at unprotected heights; could perform occasional climbing of ramps and stairs; could occasionally stoop, crouch, kneel, and crawl; could frequently use his left hand; was able to understand, remember, and carry out

7

simple instructions; required regular work duties and expectations with occasional changes; and could have occasional interaction with co-workers but no public interaction.

In assessing that RFC, the ALJ considered Boelter's subjective allegations about his impairments, the objective medical evidence, and the prior administrative medical findings and medical opinions. R. 24–30. The ALJ determined that Boelter's statements concerning the intensity, persistence, and limiting effects of his impairments were inconsistent with his treatment history. R. 24–28. The ALJ discussed in detail the objective evidence concerning Boelter's musculoskeletal issues, obesity, left upper extremity ailments, diabetes, and mental health issues. R. 25–28. As for the opinion evidence, the ALJ found Dr. Olvey's opinions partially persuasive and the state-agency reviewing psychologists' findings generally persuasive. R. 28–29. The ALJ determined that the reviewing psychologists' paragraph B findings were generally supported by the record; however, according to the ALJ, their mental RFC findings were vague and not stated in vocationally relevant terms. Finally, the ALJ determined that Boelter's use of a cane was not medically necessary. R. 29–30.

The ALJ then continued with the sequential evaluation process. At step four, the ALJ determined that Boelter was unable to perform any of his past relevant work. R. 30. Relying on the vocational expert's testimony, the ALJ determined at step five that there were jobs that existed in significant numbers in the national economy that Boelter could perform. R. 31–32. He listed three examples: final assembler, inspector/sorter, and document preparer. Based on the step-five finding, the ALJ determined that Boelter was not disabled at any time since he applied for benefits. R. 32.

The Social Security Administration's Appeals Council subsequently denied Boelter's request for review, R. 2–9, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

In March 2023, Boelter filed this action seeking judicial review of the Commissioner's decision denying his claim for disability benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. The matter was reassigned to me after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 3, 6, 7. Boelter filed a brief in support of his disability claim, ECF No. 11, and the Commissioner filed a brief in support of the ALJ's decision, ECF No. 20.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse the Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). "When reviewing the record, this court may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v.*

*Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, the court must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Boelter challenges only the RFC assessed by the ALJ, arguing that the ALJ did not adequately account for all his mental and physical limitations.

**I.     The ALJ Did Not Reversibly Err in Assessing Boelter's Mental Limitations**

The ALJ determined that Boelter suffered from severe, but not disabling, depression and anxiety. According to the ALJ, Boelter had a moderate limitation in both interacting with others and concentrating, persisting, or maintaining pace. The ALJ said she accommodated those limitations by restricting Boelter to occasional interaction with co-workers, no interaction with the public, and understanding, remembering, and carrying out only simple instructions.

Boelter argues that the ALJ failed to account for his moderate limitations in concentration, persistence, and pace (or CPP in the lexicon of social security law). Relying primarily on *Crump v. Saul*, he contends that the mental RFC assessed by the ALJ is insufficient on its face because it does not address time and speed restrictions. Boelter also criticizes the ALJ for failing to explain how limiting Boelter to understanding, remembering, and carrying out simple instructions accounts for his moderate CPP limitations.

The Seventh Circuit has emphasized "that 'both the hypothetical posed to the [vocational expert] and the ALJ's RFC assessment must incorporate all of the claimant's

10

limitations supported by the medical record,' including even moderate limitations in concentration, persistence, or pace." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (quoting *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)). "The best way to do that is by including the specific limitations—like CPP—in the hypothetical." *Id.* (citing *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018)). However, "there is no magic words requirement." *Id.* Reviewing courts "will let stand 'an ALJ's hypothetical omitting the terms concentration, persistence, and pace when it [is] manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform.'" *Kuykendoll v. Saul*, 801 F. App'x 433, 438 (7th Cir. 2020) (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010)).

Although no magic words are required, the Seventh Circuit has "underscored that the ALJ generally may not rely merely on catch-all terms like 'simple, repetitive tasks' because there is no basis to conclude that they account for problems of concentration, persistence or pace." *Crump*, 932 F.3d at 570 (citing *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019)). "[O]bserving that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including, for example, over the course of a standard eight-hour work shift." *Id.* Nevertheless, the court has not endorsed a "categorical rule that an ALJ may never accommodate 'moderate' limitations in concentration, persistence, and pace with only a restriction to simple tasks." *Webber v. Kijakazi*, No. 20-2990, 2021 WL 3671235, 2021 U.S. App. LEXIS 24776, at *15 (7th Cir. Aug. 19, 2021) (citing *Lothridge v. Saul*, 984 F.3d 1227, 1234 (7th Cir. 2021)). Fashioning a claimant's RFC requires "an individualized assessment of [his] specific symptoms." *Bruno v. Saul*, 817 F. App'x 238, 242 (7th Cir. 2020) (citing *Martin*, 950 F.3d at 373–74). Thus, reversal is not required "so long

11

as the assessment 'incorporate[s] all of the claimant's limitations supported by the medical record.'" *Webber*, 2021 U.S. App. LEXIS 24776, at *15 (quoting *Crump*, 932 F.3d at 570).

Boelter has failed to show that the ALJ here reversibly erred in addressing his CPP limitations. The ALJ considered nearly all the available evidence, determined that Boelter had a moderate limitation in that broad functional area, and explained that she accounted for that limitation by finding Boelter capable of understanding, remembering, and carrying out simple instructions. *See* R. 23–24, 27–28, 30. Contrary to Boelter's suggestion, ALJs are not required to separately address time and speed every time they assess a CPP limitation. "A moderate rating in maintaining concentration, persistence, and pace means the claimant is so limited in *at least one of* those areas, not necessarily all three." *Lockett v. Saul*, 834 F. App'x 236, 239 (7th Cir. 2020) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(3)(f)). The ALJ did not assess a specific persistence or pace limitation in this case because she didn't need to—the record demonstrated that persistence and pace would not pose a problem if the tasks were simple. Boelter, who bears the burden of demonstrating disability, cites no evidence compelling a need for persistence- or pace-specific restrictions. *See id.*; *see also Pate v. Kijakazi*, No. 20-3207, 2021 WL 3627118, 2021 U.S. App. LEXIS 24484, at *7–8 (7th Cir. Aug. 17. 2021) (finding no error in limiting the plaintiff to "simple and repetitive tasks" because he failed to "identify evidence that suggested an inability to perform simple tasks on a sustained basis").

Similarly, Boelter presents no evidence suggesting that he had greater CPP limitations than the ALJ found. The state-agency reviewing psychologists found that Boelter did not have any sustained concentration and persistence limitations, no other medical source offered an opinion on Boelter's abilities in that functional area, and Boelter did not describe any mental health limitations at the administrative hearing. Boelter did assert in function reports that he

12

had difficulty concentrating, completing tasks, and following along with written and verbal instructions. But the record contains little other evidence of concentration issues, and the ALJ found Boelter's alleged statements inconsistent with the record—a finding that's not challenged here. So, while the ALJ arguably could have beefed up her explanation regarding CPP limitations, Boelter does not identify any evidence that suggested an inability to understand, remember, and carry out simple instructions on a sustained basis. That fact alone distinguishes our case from *Crump*. *See Pate*, 2021 U.S. App. LEXIS 24484, at *7–8 (finding *Crump* inapplicable where the plaintiff failed to identify evidence suggesting greater restrictions than the ALJ found); *Lockett*, 834 F. App'x at 239 (same); *Morrison v. Saul*, 806 F. App'x 469, 474 (7th Cir. 2020) (same).

Finally, Boelter "posits no relevant limitations in concentration, persistence, or pace that the ALJ should have included in [her] RFC assessment." *Kuykendoll*, 801 F. App'x at 438 (citing *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019)). He says the ALJ should have included a limitation for off-task behavior or the need for frequent, unscheduled breaks. However, Boelter does not identify *any* evidence supporting those additional limitations. Boelter therefore has not demonstrated that the ALJ reversibly erred in assessing his CPP limitations.

Boelter also argues that the ALJ failed to account for his moderate limitations in interacting with others. He criticizes the ALJ for not adopting the limitation found by reviewing psychologist Dr. Barthell, asserting that an inability to accept instructions and respond appropriately to criticism from supervisors would preclude unskilled work. But Dr. Barthell never made such a finding. Rather, Dr. Barthell found that Boelter was moderately limited only in his ability to accept instructions and respond appropriately to criticism from

13

supervisors, R. 65–69, meaning his "functioning in this area independently, appropriately, effectively, and on a sustained basis is *fair*," 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c) (emphasis added). Dr. Barthell also explained that Boelter's mental health symptoms would be aggravated by situations requiring criticism from authority figures and that supervisor feedback would be better received with focus on strengths and in a private setting. R. 69. Although the ALJ found Dr. Barthell's assessment generally persuasive, she noted that the reviewing psychologist's narrative findings were vague, speculative, and not stated in vocationally relevant terms. The ALJ therefore adequately explained why she did not adopt Dr. Barthell's social interaction findings as her own.

Moreover, Boelter does not identify any evidence suggesting that he was unable to accept instructions or respond appropriately to criticism from supervisors. He says that he reported issues getting along with others, at times he yelled at his providers, and the record documented other instances of agitated or irritable behavior. But this is the same evidence the reviewing psychologists and the ALJ relied upon to find only a moderate limitation in interacting with others. *See* R. 23, 65–67, 72–74. Indeed, Dr. Warren (the reviewing psychologist at the reconsideration level) believed that Boelter's issues were mainly with the general public, and he found Boelter could sustain the basic demands associated with relating adequately with supervisors and co-workers. R. 77. Boelter therefore has not demonstrated that the ALJ reversibly erred in assessing his social interaction limitations.

## II. The ALJ Did Not Reversibly Err in Assessing Boelter's Physical Limitations

Boelter also challenges the physical limitations assessed by the ALJ. The ALJ determined that Boelter suffered from eight severe, but not disabling, physical impairments, including lumbar degenerative disc disease, bilateral hip disorder, chronic pain syndrome, left

14

hand neuroma, left hand ulnar neuropathy, diabetes mellitus, diabetic peripheral neuropathy, and obesity. However, according to the ALJ, Boelter's IBS was not a severe impairment. The ALJ said she accommodated Boelter's physical impairments by limiting him to sedentary work with no climbing ropes, ladders, or scaffolds; no working at unprotected heights; only occasional climbing of ramps and stairs; only occasional stooping, crouching, kneeling, and crawling; and only frequent use of his left hand.

Boelter first argues that the ALJ failed to include in the physical RFC assessment all the limitations listed in the hypothetical RFC offered at the administrative hearing. According to Boelter, the Social Security Administration's Hearings, Appeals, and Litigation Law Manual (known as HALLEX) requires the RFC assessed by the ALJ to match one of the hypothetical questions presented to the vocational expert at the hearing and, if not, requires an explanation for the discrepancy. Pl.'s Br. 19 (citing HALLEX I-2-8-20). That policy, however, governs the written instructions ALJs must provide their opinion writers, if they use them; it does not cover the content of ALJ decisions. Moreover, Boelter's own chart shows that the second hypothetical included every limitation contained in the assessed RFC plus two additional restrictions (occasional balancing and no concentrated exposure to fumes, dust, and environmental irritants) that didn't make the cut. The matching problem is therefore harmless—if the hypothetical person could work as a final assembler, an inspector, and a document preparer with all the posed limitations, then clearly those same jobs (and potentially others) would be available if those two limitations were removed.

Next, Boelter argues that the ALJ erred in addressing the functional limitations stemming from his left hand impairment. He contends that the vocational expert's testimony cannot be relied upon at step five because the ALJ failed to define what she meant when she

15

found Boelter could "frequently use his left hand." R. 24. However, the vocational expert did not express any confusion about that phrasing when asked by the ALJ, and Boelter's attorney did not object or ask the expert any follow-up questions. *See* R. 56–60.

While the ALJ could have been more specific—e.g., limiting Boelter's reaching, handling, fingering, or feeling—the broader restriction could only benefit Boelter. The RFC assessed by the ALJ limited Boelter to frequent use of the entire arm; a more specific manipulative limitation would have resulted in a *less restrictive RFC* and likely more jobs Boelter could perform. Indeed, each of the three sedentary jobs offered by the vocational expert require no feeling and only frequent reaching, handling, and fingering. *See Dictionary of Occupational Titles* (Final Assembler – DOT code 713.687-018; Inspector/Sorter – DOT code 521.687-086; Document Preparer – DOT code 249.587-018). The vocational expert testified that a limitation to occasional use of the left hand would reduce the occupational base, *see* R. 58, but Boelter does not argue that he had greater restrictions using his left hand beyond what the ALJ assessed. As the ALJ noted in her decision, Boelter's hand specialist believed that he could use his left hand for light activities due to difficulty with weight bearing greater than five to ten pounds. R. 28 (citing Exhibit 12F/1). Boelter does not identify any evidence suggesting that he was unable to perform sedentary work[3] with the additional limitations found by the ALJ (i.e., frequent use of left hand and no climbing of ladders, ropes, or scaffolds).

Boelter also argues that the physical RFC assessment should have accounted for his well-documented use of a cane for walking. "To find that a hand-held assistive device is

---

[3] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 416.967(a).

16

medically required, there must be medical documentation establishing the need for a handheld assistive device to aid in walking or standing, and describing the circumstances for which it is needed." Social Security Ruling (SSR) 96-9p, Policy Interpretation Ruling, Titles II and XVI: Determining Capability to Do Other Work—Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work, 1996 WL 374185, 1996 SSR LEXIS 6, at *19 (July 2, 1996). Here, the ALJ reasonably determined that Boelter's use of a cane was not medically necessary. The ALJ noted Boelter reported using a cane whenever he left home and treatment records documenting Boelter's reported falls. R. 29 (citing Exhibits 4F/37; 5F/35; 6F/11; 7F/7; 9F/25, 87, 130; 13F/7). However, as the ALJ observed, the cane was not formally prescribed, there was little evidence to corroborate the alleged falls, and providers did not note any balance issues during Boelter's visits. R. 29–30. Even if the cane were medically required, any error in not including that limitation in the RFC assessment would be harmless—the vocational expert testified unequivocally that all the sedentary positions he identified could be done with a cane. *See* R. 57–59.

Finally, Boelter argues that the ALJ failed to include limitations in the RFC related to his IBS and hemorrhoids. When assessing a claimant's RFC, the ALJ must consider the limiting effects of all his impairments, even those that are not severe. *See* 20 C.F.R. § 416.945(e); SSR 96-8p, Policy Interpretation Ruling, Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, 1996 SSR LEXIS 5, at *14–15 (July 2, 1996). The ALJ determined that Boelter's gastrointestinal issues did not more than minimally impact his ability to perform basic work activities and did not include any resulting limitations in the RFC assessment. R. 21. Boelter says the ALJ should have considered adding an off-task limitation or required that he be near a restroom. In support, he cites evidence

17

from January and February 2021 documenting issues with diarrhea and frequent bowel movements. *See* Pl.'s Br. 24 (citing Exhibits 4F/2; 5F/19; 6F/11, 29, 33). The ALJ, however, explicitly considered this evidence in her decision, noting that Boelter sought emergency treatment in February 2021 for rectal pain and diarrhea. R. 21 (citing Exhibits 1F/3–4; 4F/1–3; 6F). The ALJ also noted that Boelter reported some improvement in his diarrhea following a change in medications and that the record contained little evidence of ongoing IBS issues. R. 21 (citing Exhibits 6F/5; 9F). Boelter does not present any evidence contradicting that finding.

\*   \*   \*

In sum, the ALJ did not reversibly err in evaluating Boelter's mental and physical limitations, and substantial evidence supports the RFC she assessed. Boelter does not identify any evidence compelling additional restrictions beyond those found by the ALJ. And Boelter overwhelmingly fails to point out what those additional restrictions would be.

## CONCLUSION

For all the foregoing reasons, I find that substantial evidence supports the ALJ's decision and that Boelter has not demonstrated that the ALJ committed reversible error in denying Boelter's disability claim. I therefore **AFFIRM** the Commissioner's decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 23rd day of February, 2024.

_____
STEPHEN C. DRIES
United States Magistrate Judge